## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

STATE OF MAINE and )
MAINE DEPARTMENT OF MARINE )
RESOURCES, )
       )
       )
       Plaintiffs, )
       )
       v. )      Civil Action No. _____
       )
NATIONAL OCEANIC AND )
ATMOSPHERIC ADMINISTRATION; )
LAURA GRIMM, in Her Official Capacity )
as Chief of Staff performing the duties of )
Under Secretary of Commerce for Oceans )
and Atmosphere and NOAA Administrator; )
UNITED STATES DEPARTMENT )
OF COMMERCE; and )
HOWARD LUTNICK, in His Official )
Capacity as Secretary of Commerce, )
       )
       Defendants. )

## COMPLAINT
### (INJUNCTIVE RELIEF SOUGHT)

<u>INTRODUCTION</u>

1. In this lawsuit, the State of Maine and the Maine Department of Marine Resources ("DMR") challenge the National Oceanic and Atmospheric Administration's ("NOAA") termination of a $9 million federal grant awarded to DMR for *Transformational Habitat Restoration and Connectivity in Downeast Maine*, a project to restore tidal salt marsh habitat and protect coastal infrastructure from flooding in an underserved region ("Project"). NOAA, an agency within the United States Department of Commerce, terminated the grant pursuant to 2 C.F.R. § 200.340(a)(4), purportedly because the Project

"no longer effectuates the program goals or agency priorities."  *See* Ex. A at 1 (citing 2 C.F.R. § 200.340(a)(4)).

2.  NOAA has not offered any explanation of why the Project no longer effectuates program goals or agency priorities.  Indeed, upon information and belief, NOAA has not terminated funding for at least seventeen other salt marsh restoration projects under the same federal grant program, and NOAA continues to publicly espouse the benefits of these projects. Further, even after terminating the Project grant, NOAA publicized the availability of similar funding and invited applications for similar coastal and estuarine restoration projects.  The Project grant has been singled out for termination.

3.  Despite NOAA's lack of explanation for the termination, context strongly suggests that the Project grant was terminated for a reason entirely unrelated to the Project's merits.  The backdrop for NOAA's otherwise inexplicable decision is the State of Maine's ongoing dispute with the Trump Administration over Title IX of the Civil Rights Law of 1964 and the participation of transgender girls and women on girls' and women's teams in school athletic programs.  The absence of any reasoned explanation for NOAA's funding decision, the timing of the decision, and the fact that the Project grant is the only salt marsh restoration grant to be terminated strongly suggest that NOAA's decision is a punitive or coercive salvo in this ongoing dispute, entirely unrelated to salt marsh restoration or NOAA priorities.

4.  By unreasonably singling out the Project grant; by terminating funding without providing a reasoned explanation; by failing to comply with and acting beyond the authority provided to NOAA by the regulations governing grant termination; by pretextually terminating a grant for habitat restoration and coastal resilience as a means of punishing or coercing the

State of Maine in connection with an unrelated policy dispute; and/or by impliedly redefining its agency priorities in a way that is inconsistent with the Congressional appropriation under which the Project grant was awarded, NOAA's decision was arbitrary and capricious and outside its legal authority; violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706; violated the Appropriations and Take Care clauses of the United States Constitution, U.S. Const. art. I, § 9, cl. 7; *id.* art. II, § 3; violated the Tenth Amendment to the United States Constitution, U.S. Const. amend. X; and constituted an unlawful *ultra vires* action.

<u>JURISDICTION AND VENUE</u>

5.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the APA.

6.  Jurisdiction over Plaintiffs' APA claims lies with this Court because Plaintiffs are "seeking funds to which [they are] allegedly entitle[d], rather than money in compensation for the losses, whatever they may be, that [Plaintiffs] will suffer or ha[ve] suffered by virtue of the withholding of those funds." *Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988) (internal quotation marks omitted). That is, jurisdiction in this Court is proper because Plaintiffs' claims constitute an equitable action for specific relief rather than an action for "money damages." *See id.* at 893-94; *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025).

7.  Plaintiffs do not base their claims on a contractual relationship with NOAA or ask this Court to interpret and enforce—or even review—the terms and conditions of any contractual agreement or grant. Rather, Plaintiffs simply ask this Court to interpret governing federal law. *See Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, --- F. Supp. 3d ----, 2025 WL 1116157, at *13 (D.R.I. Apr. 15, 2025).

8.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2), (e)(1).  Defendants are United States agencies and officer of the United States sued in their official capacities.  The State of Maine and the Maine Department of Marine Resources are residents of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the District of Maine.

<u>PARTIES</u>

9.  The State of Maine is a sovereign state of the United States of America and is represented by Attorney General Aaron M. Frey.

10. The Maine Department of Marine Resources is a state agency established "to conserve and develop marine and estuarine resources; to conduct and sponsor scientific research; to promote and develop the Maine coastal fishing industries; to advise and cooperate with local, state, and federal officials concerning activities in coastal waters; and to implement, administer, and enforce the laws and regulation necessary for these purposes."  12 M.R.S. § 6021 (2024).

11. The Maine Attorney General is authorized to pursue this action on behalf of the State of Maine and the Maine Department of Marine Resources pursuant to 5 M.R.S. § 191 (2024).

12. Defendant United States Department of Commerce ("USDOC") is a cabinet agency within the executive branch of the United States government.

13. Defendant NOAA is an agency within USDOC with a mission to "understand and predict changes in climate, weather, ocean, and coasts, to share that knowledge and information wither others, and to conserve and manage coastal and marine ecosystems and resources."[1]

---

[1] NOAA, *About our agency*, https://www.noaa.gov/about-our-agency (last visited May 28, 2025).

14. Defendant Howard Lutnick is the Secretary of Commerce and is the highest-ranking official of the USDOC.  He is sued in his official capacity.

15. Defendant Laura Grimm is Chief of Staff performing the duties of Under Secretary of Commerce for Oceans and Atmosphere and NOAA Administrator.  She is sued in her official capacity as NOAA's highest-ranking official.

FACTUAL ALLEGATIONS

***NOAA's Transformational Habitat Restoration and
Coastal Resilience Grant Program***

16. In 2021, Congress appropriated funds for NOAA in the Infrastructure Investment and Jobs Act (also known as the Bipartisan Infrastructure Law) and the Inflation Reduction Act to promote habitat restoration and coastal resilience.  Among other appropriations, Congress provided as follows:

- $491,000,000 shall be for contracts, grants, and cooperative agreements to provide funding and technical assistance for purposes of restoring marine, estuarine, coastal, or Great Lakes ecosystem habitat, or constructing or protecting ecological features that protect coastal communities from flooding or coastal storms;

- $207,000,000 shall be for habitat restoration projects . . .; [and]

- $400,000,000 shall be for restoring fish passage by removing in-stream barriers and providing technical assistance . . . .

Infrastructure Investment and Jobs Act, Pub. L. 117-58, 135 Stat. 429, 1355 (2021).

17. Pursuant to these appropriations, NOAA implemented the *Transformational Habitat Restoration and Coastal Resilience* grant program within the NOAA Fisheries Office of Habitat Conservation, a program charged with "[p]rotecting and restoring habitat to sustain

fisheries, recover protected species, and maintain resilient coastal communities and ecosystems."[2]  The grant program provides funding for projects that

> will have a transformative impact for coastal communities and tribes across the country.  They will help sustain our nation's fisheries, make significant strides in the recovery of threatened and endangered species, and help protect coastal communities and ecosystems from the impacts of climate change.  They will support efforts such as reconnecting rivers to their historic floodplains, outplanting corals to rebuild reefs, building living shorelines that protect coasts from erosion and sea level rise, and more.[3]

18. The Notice of Funding Opportunity issued by NOAA further described the grant program as follows:

> This funding opportunity seeks habitat restoration projects that enhance coastal resilience. . . . Strengthening coastal resilience means preparing and adapting coastal communities to mitigate the impacts of, and more quickly recover after, extreme weather events such as hurricanes, coastal storms, and flooding, as well as longer-term climate hazards, such as sea level rise. Habitat restoration and natural and nature-based infrastructure are critical to doing so, by protecting lives and property; sustaining commercial, recreational, and subsistence fishing; recovering threatened and endangered species; and maintaining and fostering vibrant coastal economies.  This funding opportunity . . . aims to fund projects that support the overarching goal of enhancing coastal resilience.

Ex. B at 2.

### The Project: Transformational Habitat Restoration and Connectivity in Downeast Maine

19. On June 10, 2024, DMR applied for funding from the grant program for the *Transformational Habitat Restoration and Connectivity in Downeast Maine* project in the towns of Addison and Columbia, located in Washington County.  Specifically, DMR

---

[2]  NOAA Fisheries, About Us: Office of Habitat Conservation, https://www.fisheries.noaa.gov/about/office-habitat-conservation (last visited May 28, 2025).

[3] NOAA Fisheries, *Transformational Habitat Restoration and Coastal Resilience Grants*, https://www.fisheries.noaa.gov/grant/transformational-habitat-restoration-and-coastal-resilience-grants (last visited May 28, 2025).

applied for funding to replace a failing road crossing on the West Branch Pleasant River,
elevate the road, and relocate water and septic systems associated with that crossing. The
road crossing is an impediment to tidal flow and fish passage, and it is vulnerable to
flooding during high precipitation events. As outlined in DMR's application, the Project
is part of a larger effort to restore tidal flow, "ecosystem services[,] and natural functions
of the fresh and saltwater habitats in the West Branch Pleasant River," which is "one of
DMR's highest priority restoration projects in Downeast Maine." Ex. C at 1.[4]

20. In the application, DMR explained that the Project will

> benefit[] several commercially and recreationally important
> species . . . such as striped bass, Atlantic cod, pollock, hake, bluefish,
> flounder, American lobster, alewife, blueback herring, American shad,
> rainbow smelt, and American eel. Th[e] project will also benefit NOAA
> Species in the Spotlight Endangered Atlantic salmon and Endangered
> Species Act-listed Atlantic and shortnose sturgeon . . . . Washington
> County, Maine, is one of the most fisheries-dependent regions along the
> East Coast of the United States. . . . The towns in the project area are not
> only dependent on fisheries but are also critically underserved
> communities.

*Id.* at 2.

21. DMR further explained that the Project will enhance the community resilience of the
affected towns:

> Addison and Columbia are also ranked as 'most vulnerable' in Maine's
> Coastal Risk Explorer that shows social vulnerability to sea level rise in
> coastal communities. Both projects will enhance community resilience
> through flood mitigation, reducing risk of catastrophic structural failure,
> and improved water quality. Community resilience will also be supported
> through population increases of important harvested species in the region,
> and the associated ecological resilience that results from fish population
> improvement and habitat restoration.

*Id.*

---

[4] The attached exhibit is DMR's updated narrative and project summary, which was revised to exclude a project that
was part of the initial application but not part of the eventual grant award.

22. On August 15, 2024, DMR received a Notice of Award from NOAA allocating $9 million in federal funds for the Project.[5]  Ex. D  at 1-3.

### President Trump Targets the State of Maine Over Transgender Policy

23. Donald J. Trump was sworn in as President of the United States on January 20, 2025. Shortly thereafter, he issued a series of Executive Orders regarding the federal government's definition of "sex" and the participation of transgender girls and women in school sports.  On February 5, 2025, President Trump issued Executive Order 14201, entitled "Keeping Men Out of Women's Sports," which stated, inter alia, "it is the policy of the United States to rescind all funds from educational programs that deprive women and girls of fair athletic opportunities, which results in the endangerment, humiliation, and silencing of women and girls and deprives them of privacy" and directed, "[a]ll executive departments and agencies (agencies) shall review grants to educational programs and, where appropriate, rescind funding to programs that fail to comply with the policy established in this order."[6]

24. On February 20, 2025, President Trump stated at a gathering of Republican governors that he "heard men are still playing in Maine," apparently referring to transgender girls and women participating in school sports.  He continued: "[W]ell, I hate to tell you this, but we're not going to give them any federal money.  They are still saying we want men to

---

[5] The award number is NA24NMFX463C0066-T1-01.

[6] Exec. Order No. 14201, *Keeping Men Out of Women's Sports* (Feb. 5, 2025),
https://www.whitehouse.gov/presidential-actions/2025/02/keeping-men-out-of-womens-sports (last visited May 28, 2025).

play in women's sports, and I cannot believe that they're doing that . . . so, we're not going to give them any federal funding—none whatsoever—until they clean that up."[7]

25. The next day, on February 21, 2025, President Trump addressed a group of governors, including Maine Governor Janet Mills, at a meeting of the National Governors Association.[8]

26. President Trump asked Governor Mills whether she was going to comply with his Executive Order prohibiting the participation of transgender girls and women in school sports. Governor Mills responded: "I'm complying with state and federal law." President Trump responded: "Well, we are the federal law. You'd better do it. You'd better do it, because you're not going to get any federal funding at all if you don't." Governor Mills responded: "See you in court." President Trump then said: "I look forward to that—that should be a real easy one."[9]

27. Subsequently, President Trump stated that he "need[s] a full throated apology from the Governor herself, and a statement that she will never make such an unlawful challenge to the Federal Government again, before this case can be settled."[10]

28. On February 27, 2025, six days after President Trump threatened Governor Mills with the termination of federal funding, the Acting Social Security Administrator emailed his staff

---

[7] *Watch: Trump speaks to Republican governors*, Feb. 20, 2025, 45:36-46:11, https://thehill.com/video-clips/5155659-watch-live-donald-trump-republican-governors-association/ (last visited May 28, 2025).

[8] *See Trump administration orders investigation after Gov. Mills publicly defies president over transgender policy*, Portland Press Herald, Feb. 21, 2025, https://www.pressherald.com/2025/02/21/trump-threatens-to-cut-federal-funding-to-maine-over-transgender-athlete-policy (last visited May 28, 2025).

[9] *Id.*

[10] *See Trump presses Maine governor for 'full throated apology' after transgender athlete spat*, The Hill, Mar. 22, 2025, https://thehill.com/homenews/lgbtq/5208797-donald-trump-maine-governor-transgender-sports-policy (last visited May 28, 2025).

regarding terminating the State of Maine's contracts with the Social Security Administration. A staff member warned that "[t]erminating the contracts would result in improper payments and potential for identity theft." The Administrator responded: "Please cancel the contracts. While our improper payments will go up, and fraudsters may compromise identities, no money will go from the public trust to a petulant child," referring to Governor Mills.[11]

29. When asked to comment on the Administrator's actions, a White House spokesman stated:

> Governor Mills would rather cater to the anti-science and anti-women lunatics of the transgender movement than uphold her constitutional obligations to the laws of her state, and more importantly the Constitution. President Trump has been clear in his demands and the ball is in the Governor's court. Choosing the rights of men who want to dominate women's sports over the rights of vulnerable women and girls while blatantly ignoring federal law will not end well for the Governor and the people of Maine deserve better.[12]

30. On April 2, 2025, Governor Mills received a letter from Secretary of Agriculture Brooke Rollins freezing United States Department of Agriculture ("USDA") funds based on the State of Maine's purported non-compliance with Title IX, 20 U.S.C. § 1681 *et seq.* *See* Ex. E.

31. The April 2, 2025, letter began by stating:

> You cannot openly violate federal law against discrimination in education and expect federal funding to continue unabated. Your defiance of federal law has cost your state, which is bound by Title IX in educational programming. Today, I am freezing Maine's federal funds for certain administrative and technological functions in schools. *This is only the*

---

[11] *See* Letter from Rep. Connolly to Leland Dudek, Acting Administrator, U.S. Soc. Sec. Admin., Apr. 1, 2025,https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/evo-media-document/2025-04-01-gec-to-ssa-dudek-re-maine.pdf (last visited May 28, 2025).

[12] *See Emails Confirm Social Security Administration Canceled Maine Contracts as Political Payback*, The Huffington Post, Apr. 2, 2025, https://www.huffpost.com/entry/janet-mills-social-security-maine-leland-dudek_n_67ed2d99e4b0b937ab8f135c (last visited May 28, 2025).

*beginning*, though you are free to end it at any time by protecting women and girls in compliance with federal law.

*Id.* at 1 (emphasis added).

32. The April 2, 2025, letter also stated that "USDA has launched a full review of grants awarded by the Biden Administration to the Maine Department of Education," that "[m]any of these grants appear to be wasteful, redundant, or otherwise against the priorities of the Trump Administration," and that "USDA will not extend the Biden Administration's bloated bureaucracy and will instead focus on a Department that is farmer-first and without a leftist social agenda." *Id.* at 1-2.

33. In an April 16, 2025, press conference announcing the filing of a Title IX suit against the Maine Department of Education by the United States Department of Justice, United States Attorney General Pam Bondi stated in part:

> We want to get states to comply with us, that's what this is about. . . . *We've stripped grants from Maine through other departments and we are going to continue to fight for women.*[13]

34. The USDA's freeze of funds to the State of Maine was the subject of a separate lawsuit in the District of Maine. On April 11, 2025, the district court granted the State of Maine's Motion for  Temporary Restraining Order and ordered USDA to release federal funding to the State. *Maine v. U.S. Dep't of Agric.*, 1:25-cv-00131-JAW, 2025 WL 1088946, at *31 (D. Me. Apr. 11, 2025). The matter was subsequently settled. Under the settlement, USDA agreed to "refrain from freezing, terminating, or otherwise interfering with the State of Maine's access to [USDA] funds . . . without first following all legally required procedures." Ex. F at 3.

---

[13] C-SPAN, *Attorney General Bondi Announces Lawsuit Against Maine*, Apr. 16, 2025, 2:25-2:50, https://www.c-span.org/program/news-conference/attorney-general-bondi-announces-lawsuit-against-maine/658667(emphasis added) (last visited May 28, 2025).

35. Upon information and belief, additional federal grant funding in Maine unrelated to school sports has been suspended or terminated in recent months on the basis of purported non-compliance with Title IX.

### *NOAA Terminates the Project Grant While Continuing to Fund Other Program Grants*

36. Days after Governor Mills received the letter freezing USDA funds, DMR received a letter from Timothy Carrington, Acting Director, NOAA Grants Management Division.  The one-page letter dated April 9, 2025, informed DMR that "[USDOC] will cease funding *Transformational Habitat Restoration and Connectivity in Downeast Maine* award [sic] . . . through [NOAA], pursuant to to [sic] Section 200.340 of the 2 C.F.R." Ex. A at 1.

37. The April 9, 2025, letter's entire explanation for terminating the $9 million grant was as follows:

> As part of efforts to streamline and reduce the cost and size of the Federal Government, [USDOC] is reprioritizing funding and staff to support only those activities directly related to its current programmatic goals and mission priorities.  After careful review of this award, the Department has determined that *Transformational Habitat Restoration and Connectivity in Downeast Maine* activities are no longer aligned with effectuating those undertaking, nor relevant to the current focus of the Administration's objectives.  Specifically, NOAA has concluded that the initial planning and design for this project is an overuse of taxpayer dollars.  The stated goal and description of the program—restoration of salt marsh and related effects—falls outside of the current direction NOAA is taking regarding habitat restoration at this time.  The program also appears to be better suited for another governmental entity, whether state or federal.

> *Id.*

38. The April 9, 2025, letter stated that the decision to "cease funding" for the Project was not made pursuant to the specific terms and conditions of the grant but rather pursuant to 2 C.F.R. § 200.340(a)(4), which provides that a federal award may be terminated "to the

extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *See* Ex. A at 1.

39. All federal funds for the Project were terminated as of April 9, 2025. *See id.*; Ex. G at 4.

40. Despite NOAA's statement that the "restoration of salt marsh and related effects" no longer aligns with the agency's "focus" or "current direction," Ex. A at 1, Plaintiffs assert, on information and belief, that the Project grant under the *Transformational Habitat Restoration and Coastal Resilience* program is the only such salt marsh restoration grant that has been terminated.

41. To date, "NOAA has run two rounds of the *Transformational Habitat Restoration and Coastal Resilience* funding opportunity under the Bipartisan Infrastructure Law and Inflation Reduction Act. In the first round of funding, NOAA awarded more than $265 million in funding for thirty-eight projects. In the second round of funding, NOAA recommended nearly $220 million in funding for thirty-two projects."[14]

42. Since terminating the grant for the Project, NOAA has continued to fund—and publicly espouse the benefits of—projects outside of Maine that are funded under the *Transformational Habitat Restoration and Coastal Resilience* grant program, including projects to restore salt marshes as a means of restoring habitat and improving coastal resilience. *See, e.g.,* NOAA Fisheries, *Habitat Restoration Under the Infrastructure Investment and Jobs Act*, https://www.fisheries.noaa.gov/national/habitat-conservation/habitat-restoration-under-infrastructure-investment-and-jobs-act (last visited May 28, 2025) (stating that "NOAA's Office of Habitat Conservation is making a historic

---

[14] NOAA Fisheries, *Transformational Habitat Restoration and Coastal Resilience Projects Selected for Funding,* https://www.fisheries.noaa.gov/national/habitat-conservation/transformational-habitat-restoration-and-coastal-resilience-projects (last visited May 28, 2025).

impact to restore coastal habitats and support communities across the country" and highlighting "[n]early $220 million for 32 grants selected through the *Transformational Habitat Restoration and Coastal Resilience* funding opportunity" in the second round of funding and "[m]ore than $265 million for 38 awards selected through the *Transformational Habitat Restoration and Coastal Resilience* funding opportunity" in the first round); NOAA Fisheries, *Transformational Habitat Restoration and Coastal Resilience Projects Selected for Funding*, https://www.fisheries.noaa.gov/national/habitat-conservation/transformational-habitat-restoration-and-coastal-resilience-projects (last visited May 28, 2025) ("These projects [funded under the grant program] span a broad range of habitats and restoration techniques.  They will reconnect rivers to their historic floodplains, outplant corals to rebuild reefs, restore salt marshes that protect coasts from erosion and sea level rise, and more."); *id.* (highlighting seven active salt marsh restoration projects funded by the *Transformational Habitat Restoration and Coastal Resilience* program).

43. NOAA also has continued to publicly espouse the importance of salt marshes and salt marsh restoration efforts.  On March 21, 2025, NOAA dedicated a feature story on its website, "Marsh Madness," to "keeping score of all the ways marsh habitat play an important role in the protection and restoration work we do for communities, fish, and wildlife" and highlighting efforts to protect and restore coastal wetlands, "a pivotal part of the natural system, providing tremendous benefits for coastal ecosystems and communities."[15]

---

[15]   NOAA Fisheries, *Marsh Madness*, Mar. 1, 2025, https://www.fisheries.noaa.gov/feature-story/marsh-madness (last visited May 28, 2025).

44. Further, NOAA just recently solicited applications, with an application deadline of May 12, 2025, for "Coastal Habitat and Resilience Grants for Tribes and Underserved Communities, Under [Bipartisan Infrastructure Law] Round 3." Grants will be awarded to support "capacity building, meaningful engagement, and restoration project activities that enhance resilience of . . . underserved communities and have the greatest potential to lead to habitat restoration in coastal, estuarine, marine, and Great Lakes areas." Ex. H at 3.

### NOAA's Termination of the Project Grant
### Will Harm the State of Maine and the Affected Communities

45. NOAA's termination of the Project grant will have a significant impact on Plaintiffs' efforts to restore the ecosystem services and natural functions of the fresh and saltwater habitats in the West Branch Pleasant River and to improve coastal resilience in an underserved region. Although DMR has funding for other aspects of the larger West Branch Pleasant River restoration project, the agency does not have available funding for the critical component that was to be funded by the NOAA grant.

46. Of particular concern is the fact that the Addison Road crossing, the replacement of which would have been funded by the grant, is in "critical" condition according to the Maine Department of Transportation's rating system. Specifically, the crossing's culverts have failed, creating a large sag in the roadway, weakening the shoulder, and compromising the footing of a guardrail. DMR predicts that failure of this road crossing in conjunction with rising sea levels and intense coastal storms will increase emergency response times for the affected towns, threatening public health and safety.

47. Indeed, in a May 1, 2025, letter to Senator Susan Collins asking her to assist with restoring the grant, state legislators representing the affected towns wrote "to provide information

from our constituents on how [the grant termination] will harm our communities in Maine,"

and stated:

> The grant funded the replacement of the failing road crossing of Bells Brook on Addison Road, significant road raising, and relocating drinking and septic infrastructure in Addison and Columbia, Maine. We understand that the Maine Department of Transportation has inspected the crossing structure and concluded it is in critical condition and needs to be replaced. In addition, we know from our constituents that this road crossing experiences significant flooding repeatedly, including during two back-to-back storms that hit our communities in January [of 2024]. In fact, during the storms last year, a constituent lost her life in the flooding.

Ex. I at 1.

48. The legislators further explained:

> The towns in the project area are not only dependent on fisheries but are also critically underserved communities. Addison and Columbia are ranked as "most vulnerable" in Maine's Coastal Risk Explorer that shows social vulnerability to sea level rise in coastal communities. This grant would increase the communities' ability to connect with important transportation routes during flooding and high tide events, protect the safety of residents, reduce the risk of catastrophic structural failure of the Addison Road crossing, and improve water quality. Community resilience will also be supported through population increases of important harvested species in the region, and the associated ecological resilience that results from fish population improvement and habitat restoration.

*Id.*

## CAUSES OF ACTION

### Count I – Violation of the Administrative Procedure Act: Arbitrary and Capricious Action

49. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

50. Defendants' termination of grant funding for the *Transformational Habitat Restoration and Connectivity in Downeast Maine* project constitutes final agency action subject to review under the APA. 5 U.S.C. § 704.

16

51. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion." *Id.* § 706(2)(A).

52. Agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must therefore provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

53. Defendants' termination of the Project grant was arbitrary and capricious. Defendants did not provide a reasoned explanation or support for their contention that the Project meets the regulatory criteria for termination, specifically, that the Project "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). Per the Office of Management and Budget itself, this provision does not authorize arbitrary grant terminations. *See* Guidance for Grants and Agreements, 85 Fed. Reg. 49,506, 49,509 (Aug. 13, 2020).

54. The lack of a reasoned explanation is especially damning because, as outlined above, NOAA continues to fund at least seventeen other salt marsh restoration projects under the *Transformational Habitat Restoration and Coastal Resilience* grant program, promote the program's benefits and importance, and solicit applications for new grant awards. Defendants did not provide any explanation at all as to why the Project is the sole salt marsh restoration project that "no longer effectuates the program goals or agency priorities." *See* Ex. A at 1 (citing 2 C.F.R. § 200.340(a)(4)). If anything, the Project falls

within the core of NOAA's aptly titled *Transformational Habitat Restoration and Coastal Resilience* grant program.

55. Given that NOAA has continued to publicly espouse the benefits of salt marsh restoration and coastal resilience projects and to fund such projects in other states, its action terminating the grant funding for such a project is straightforwardly arbitrary and capricious.

56. Similarly, Defendants did not provide any reasoned explanation of why the Project alone of all salt marsh restoration projects funded under the *Transformational Habitat Restoration and Coastal Resilience* grant program "is an overuse of taxpayer dollars"; how "the initial planning and design for this project" is specifically objectionable; or why such a concern about initial planning and design costs warrants termination of the entire award. *See* Ex. A at 1.

57. Further, "the disconnect between the decision made and the explanation given"; the evidence discussed above demonstrating NOAA's anomalous treatment of the Project vis-à-vis other salt marsh restoration projects; and the backdrop of President Trump's ongoing efforts to use federal funding decisions to punish and/or coerce the State of Maine based on its purported violation of Title IX; demonstrate that Defendants' purported reasons for terminating the grant were "contrived" and pretextual, thereby violating the APA's reasoned explanation requirement. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

**Count II – Violation of the Administrative Procedure Act:**
**Action Contrary to Grant Termination Regulations**

58. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

59. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law."  5 U.S.C. § 706(2)(A).

60. The regulations governing grant termination provide that a federal agency may terminate a grant only under certain specific circumstances, including "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.  2 C.F.R. § 200.340(a)(4).  These regulations further provide that upon initiating a grant termination, "the Federal agency must provide the recipient with an opportunity to object and provide information challenging the action."  2 C.F.R. § 200.342.

61. By terminating the Project grant purportedly because the Project "no longer effectuates the program goals or agency priorities"—when the Project falls within the heartland of the Congressional appropriation supporting NOAA's *Transformational Habitat Restoration and Coastal Resilience* grant program—Defendants acted contrary to the regulations enumerating and restricting the bases for grant termination.  2 C.F.R. § 200.340(a)(4).

62. By terminating the Project grant in a manner that violates the United States Constitution and otherwise constitutes unlawful action (as outlined and further described in this Count and in Counts I and III-VI), Defendants acted contrary to the requirement in the grant termination regulations that an award may be terminated because it no longer aligns with agency priorities only "to the extent authorized by law."  *Id.*

63. By terminating the Project grant without providing Plaintiffs with "an opportunity to object and provide information challenging the action," Defendants acted contrary to the requirements of the grant termination regulations.  2 C.F.R. § 200.342.

### Count III – Violation of the Administrative Procedure Act:
### Action in Excess of Agency Authority

64. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

65. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

66. By terminating the Project grant to punish and/or coerce the State of Maine based on its purported violation of Title IX, Defendants acted in excess of their legal authority to terminate federal awards under 2 C.F.R. § 200.340.

67. By terminating the Project grant to punish and/or coerce the State of Maine based on its purported violation of Title IX, Defendants unlawfully assumed the role of agencies charged with enforcing Title IX and therefore acted in excess of their legal authority.[16]

### Count IV – Violation of the United States Constitution:
### Usurping the Legislative Function, Violation of the Separation of Powers, Appropriations Clause, Take Care Clause

68. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

69. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

---

[16] Title IX authorizes federal agencies that provide financial assistance to educational programs or activities to enforce its provisions. 20 U.S.C. § 1682. However, any federal action to terminate federal financial assistance based on a purported Title IX violation is subject to statutory process and protections for state entities receiving that financial assistance, including a right to judicial review. *Id.* §§ 1682-83. Even if NOAA were authorized to enforce Title IX—and it is not—the agency failed to follow the statutorily required processes and afford Plaintiffs the statutory protections provided by law.

70. The Take Care Clause provides that the executive must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

71. It is well-established that "[o]ur Constitution gives Congress control over the public fisc." *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 420 (2024); *see also id.* at 431 ("By the time of the Constitutional Convention, the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement. It was uncontroversial that the powers to raise and disburse public money would reside in the Legislative Branch.").

72. The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

73. Once money has been appropriated by Congress, the Executive cannot unilaterally amend or cancel such appropriations. *See Train v. City of New York*, 420 U.S. 35, 43-44 (1975); *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); 2 U.S.C. § 683 ("Any amount of budget authority proposed [by the President] to be rescinded . . . shall be made available for obligation unless, within the prescribed 45-day period, the Congress has completed action on a recission bill . . . .").

74. Rather, it is the Executive's duty to disburse appropriated funds consistent with the appropriation and governing law. U.S. Const. art. II, § 3.

75. The Executive violates the Appropriations and Take Care Clauses when it attempts to unilaterally amend, cancel, undermine, or otherwise decline to execute duly enacted Congressional appropriations. *See Train*, 420 U.S. at 43-44 ; *In re Aiken Cnty.*, 725 F.3d

at 261 n.1; *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("Needless to say, the President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting the argument that by charging the President with faithful execution of laws, the Take Care Clause "implies a power to forbid their execution"); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018) ("[T]he President's duty to enforce the laws necessarily extends to appropriations."); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb . . . .") (Jackson, J., concurring).

76. The Project falls within the heartland of the Congressional appropriation at issue, in that the appropriation is directed to "restoring . . . coastal . . . habitat, . . . [and] protect[ing] coastal communities from flooding or coastal storms." Infrastructure Investment and Jobs Act, Pub. L. 117-58, 135 Stat. 429, 1355 (2021). NOAA has no authority to unilaterally amend the purpose of this appropriation.

77. NOAA's termination of the Project grant as being inconsistent with program goals or agency priorities is accordingly an unlawful infringement upon Congress's power to appropriate public funds for specific purposes and a violation of the executive branch's obligation to administer the law in a manner consistent with Congressional appropriation, because the termination implies an unlawful redefinition of NOAA priorities that is inconsistent with that appropriation.

## Count V – Violation of the United States Constitution:
## Tenth Amendment

78. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

79. The Tenth Amendment to the United States Constitution provides, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.

80. The Tenth Amendment bars the federal government from placing conditions on grants that "are properly viewed as a means of pressuring the States to accept policy changes."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012).

81. States must also receive fair notice of the terms that apply to the disbursement of funds to them.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981); *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 583-84.

82. Defendants' termination of the Project grant to punish and/or coerce the State of Maine in response to an unrelated policy dispute, and contrary to the terms upon which the funds were appropriated and awarded, therefore violates the Tenth Amendment to the United States Constitution.

## Count VI – *Ultra Vires* Action

83. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

84. By terminating the Project grant to punish and/or coerce the State of Maine based on its purported violation of Title IX, Defendants acted beyond the bounds of their authority and have transgressed the foundational precept that the government cannot "under the pretext

of executing its powers" act "for the accomplishment of objects not intrusted to the government." *McCulloch v. Maryland*, 17 U.S. 316, 423 (1819).

85. By terminating the Project grant to punish and/or coerce the State of Maine based on its purported violation of Title IX, Defendants acted beyond the bounds of their authority to manage federal funds appropriated by Congress for the express purpose of supporting coastal habitat restoration and coastal resilience efforts.

<u>PRAYER FOR RELIEF</u>

Plaintiffs State of Maine and the Maine Department of Marine Resources request that the Court:

A. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2202, vacate and set aside Defendants' action terminating the grant awarded to the Department of Marine Resources for the *Transformational Habitat Restoration and Connectivity in Downeast Maine* project;

B. Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that Defendants' termination of the grant violated the APA;

C. Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that Defendants' termination of the grant violated the regulations governing grant termination;

D. Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that Defendants' termination of the grant violated the Appropriations and Take Care clauses of the United States Constitution;

E. Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that Defendants' termination of the grant violated the Tenth Amendment to the United States Constitution;

F. Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that Defendants' termination of the grant was an unlawful *ultra vires* action;

G. Permanently enjoin Defendants from terminating or otherwise impeding access to grant funds for the *Transformational Habitat Restoration and Connectivity in Downeast Maine* project without following all legally required procedures;

H. Award the State of Maine and the Maine Department of Marine Resources their reasonable fees, costs, and expenses, including attorney's fees, pursuant to 28 U.S.C. § 2412; and

I. Grant other such relief as this Court deems just and proper.

Dated: June 17, 2025                     Respectfully submitted,

AARON M. FREY
Attorney General

/s/ Jack Dafoe
JACK DAFOE
Assistant Attorney General
jack.dafoe@maine.gov

JASON ANTON
Assistant Attorney General
jason.anton@maine.gov

Office of the Attorney General
Six State House Station
Augusta, ME 04333
Telephone: (207) 626-8800