UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| STATE OF MAINE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:25-cv-00324-SDN |
| | ) | |
| NATIONAL OCEANIC AND | ) | |
| ATMOSPHERIC ADMINISTRATION, | ) | |
| et al., | ) | |
| | ) | |
| Respondents. | ) | |

## ORDER ON MOTION TO DISMISS

This matter comes before the Court on Respondents' motion to dismiss for lack of jurisdiction and, in the alternative, for failure to state a claim. ECF No. 15. For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Respondents' motion. The Court maintains subject matter jurisdiction over the APA and constitutional claims. Respondents' motion to dismiss Counts IV and VI for failure to state a claim is **GRANTED**, and Respondents' motion to dismiss Count V for failure to state a claim is **DENIED**.

## BACKGROUND[1]

### I.    Facts

Plaintiffs the State of Maine and the Maine Department of Marine Resources ("DMR") (collectively "the State" or "the Plaintiffs") sued the National Oceanic and Atmospheric Administration ("NOAA"), Laura Grimm, the Chief of Staff performing the duties of Under Secretary of Commerce for Oceans and Atmosphere and NOAA

---

[1] These facts are derived from the Complaint. *See Gilbert v. Me. Dep't of Health & Hum. Servs.*, 778 F. Supp. 3d 239, 247 (D. Me. 2025) ("recount[ing] the factual allegations as stated within that[] complaint for the purpose of ruling on the Defendants' motion to dismiss").

1

Administrator, the United States Department of Commerce, and Howard Lutnick, the Secretary of Commerce (collectively "the Respondents"). ECF No. 1. The State challenges NOAA's decision to terminate a $9 million award to DMR for "Transformational Habitat Restoration and Connectivity in Downeast Maine," a project intended to restore tidal salt marsh habitat and protect coastal infrastructure from flooding ("the Project"). *Id.* at ¶ 1.

In 2021, the Infrastructure Investment and Jobs Act ("IIJA") and the Inflation Reduction Act ("IRA") appropriated funds to NOAA to promote coastal resilience and habitat restoration. *Id.* at ¶ 16; *see* Pub. L. 117-58, 135 Stat. 429, 1355 (2021) (IIJA); Pub. L. No. 117-169, 136 Stat. 1818 (2022) (IRA). NOAA used a portion of these funds to implement the *Transformational Habitat Restoration and Coastal Resilience* program ("*Coastal Resilience* program"), aiming to "fund projects that support the overarching goal of enhancing coastal resilience." ECF No. 1-2 at 3–4. On June 10, 2024, DMR applied for Project funding to replace a failing road crossing located in Washington County, Maine, on the West Branch Pleasant River, elevate the road, and relocate water and septic systems. ECF No. 1 at ¶ 19. In response to this application, NOAA formally approved the request and issued a Notice of Award ("the Award") on August 15, 2024, allocating $9 million in federal funds for the Project. *Id.* at ¶ 22; *see* ECF No. 1-4.

The Award application[2] establishes that NOAA funds recipients through "cooperative agreements, as described in 2 C.F.R. § 200.1" and that "NOAA expects to be substantially involved in many aspects of the awards." ECF No. 1-2 at 12. This involvement includes "collaborating on the scope of work, providing assistance with technical aspects of the habitat restoration, reviewing and commenting on design plans, and reviewing

---

[2] The application is entitled a "Notice of Funding Opportunity." ECF No. 1-2 at 3.

procurement materials." *Id*. By issuing the Award, the agency committed a federal "share of cost" of $9 million, while earmarking the recipient's share of cost at $0. ECF No. 1-4 at 2. The Award forecast a four-year term, running from October 1, 2024, until September 30, 2028. *Id*.

On April 9, 2025, six months into the Project, DMR received a letter from the Acting Director of NOAA's Grants Management Division terminating the Award ("the Letter"). ECF No. 1 at ¶ 36. The Letter stated NOAA was ceasing Project funding pursuant to 2 C.F.R. § 200.340.[3] *Id*.; ECF No. 1-1 at 2. The Letter further noted that as part of its efforts "to streamline and reduce the cost and size of the Federal Government," it was "reprioritizing funding and staff to support only those activities directly related to its current programmatic goals and mission priorities." *Id*. NOAA concluded the Project was no longer aligned with those goals and termination of the Award took effect immediately. *Id*.

The State contends NOAA unlawfully terminated the Award to retaliate against Maine for defying President Trump's executive order prohibiting transgender girls from participating in school sports—a conclusion the State grounds in President Trump's own public threats against Governor Mills and the sequence of federal actions that followed. *See* ECF No. 1 at ¶¶ 23–35. The Complaint highlights President Trump's statement to Governor Mills that the State would not "get any federal funding" if the State did not comply with an Executive Order prohibiting the participation of transgender girls in

---

[3] Under 2 C.F.R. § 200.340(a)(4), a federal award may be terminated "[b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

school sports. *Id*. at ¶ 26.[4] On April 2, 2025, Governor Mills received a letter freezing U.S. Department of Agriculture funds; the letter explicitly cited the State's purported non-compliance with the Executive Order. *Id*. at ¶¶ 30–32. One week later, on April 9, 2025, DMR received the Letter from NOAA terminating the Award. *Id*. at ¶ 36.

The State brings six causes of action alleging that NOAA terminated the Award illegally. First, the State brings three counts under the Administrative Procedure Act ("APA") alleging the termination was arbitrary and capricious (Count I), contrary to grant termination regulations (Count II), and in excess of agency authority (Count III). *See* ECF No. 1 at 16–20. Second, the Complaint asserts constitutional violations, specifically that the Executive Branch usurped the legislative function and violated the separation of powers and the Appropriations and Take Care Clauses (Count IV). *Id*. at 20–22. Finally, the State asserts a violation of the Tenth Amendment (Count V), arguing the Respondents terminated the Project to punish or coerce the State in response to the unrelated policy dispute. *Id*. at 23.[5] The State asks the Court to vacate NOAA's actions and permanently enjoin Respondents from terminating or otherwise impeding access to Project funds without following all legally required procedures. *Id*. at 24–25.

## II.    Regulatory Framework

In the Letter, NOAA invoked 2 C.F.R. § 200.340(a) as the basis for the termination of funding, which provides that a federal agency may terminate an award to "to the extent authorized by law, if an award no longer effectuates the program goals or agency

---

[4] *See* Transcript, Kevin Miller, *Maine Faces Federal Investigation After Gov. Janet Mills Tells Trump, 'See You in Court,'* NPR (Mar. 2, 2025), https://www.npr.org/2025/03/02/nx-s1-5310653/maine-faces-federal-investigation-after-gov-janet-mills-tells-trump-see-you-in-court [https://perma.cc/MV6C-5ED6].

[5] The Court does not address the State's standalone *ultra vires* claim (Count VI), which the State is no longer pursuing. *See* ECF No. 25 at 7 n.3.

priorities." 2 C.F.R. ¶ 200.340(a)(4) (2024). The Office of Management and Budget's ("OMB") guidance, issued alongside the 2024 amendments to the Federal Register, noted that section 200.340(a)(4) allows a federal award to "include a term and condition allowing termination by the Federal agency or pass-through entity, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046-01, 30089 (Apr. 22, 2024). OMB further explained that it found "the final version of the guidance provides greater clarity on the policy for termination of awards by the Federal agency or pass-through entity by underscoring the need for agencies and pass-through entities to clearly and unambiguously communicate termination conditions in the terms and conditions of the award." *Id.* The regulations also provide that upon initiating a termination, "the Federal agency must provide the recipient with an opportunity to object and provide information challenging the action." 2 C.F.R. § 200.342 (2024). The Court must now ascertain whether it may consider the State's challenge to the Award termination.

## ANALYSIS

### I. Subject Matter Jurisdiction

Respondents challenge the Court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and alternatively argue Plaintiffs fail to state a claim upon which relief can be granted under Rule 12(b)(6). *See* ECF No. 15 at 1. "When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first." *Ne. Erectors Ass'n of BTEA v. Sec'y of Lab., Occupational Safety & Health Admin.*, 62 F.3d 37, 39 (1st Cir. 1995). In evaluating a jurisdictional challenge, the Court must credit the Plaintiffs' well-

pleaded facts and indulge every reasonable inference in the Plaintiffs' favor. *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010). Plaintiffs faced with a subject matter jurisdiction challenge carry the burden to demonstrate its existence. *Johansen v. United States*, 506 F.3d 65, 68 (1st Cir. 2007). In evaluating whether the Plaintiffs have met their burden of proof, the Court "may consider extrinsic materials and, to the extent it engages in jurisdictional factfinding, is free to test the truthfulness of the plaintiff[s'] allegations." *Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 37 (1st Cir. 2000).

### A. APA Claims (Counts I, II, and III)

Courts evaluate subject matter jurisdiction generally on a claim-by-claim basis, so the Court will first address Plaintiffs' APA claims. *See Jensen v. U.S. Nat'l Park Serv.*, 113 F. Supp. 3d 431, 434–35 (D. Mass. 2015) (evaluating claims separately for subject matter jurisdiction). Respondents' primary argument is that the Court lacks jurisdiction to hear the Plaintiffs' APA claims because the dispute, at bottom, concerns the termination of a grant and therefore sounds in contract, placing jurisdiction in the Court of Federal Claims pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1). ECF No. 15 at 1–2. The State disputes that characterization, maintaining the Award is a cooperative agreement that lacks the elements of a contract and jurisdiction is proper in this Court. ECF No. 25 at 7–8.

#### 1. Waiver Under the APA

"It is elementary that the United States, as sovereign, is immune from suit save as it consents to be sued." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quotation modified). Consequently, the extent of the Government's consent to suit defines a court's jurisdiction to hear a case. *See id*. In the context of administrative challenges, the APA provides a limited waiver of sovereign immunity, conferring a general cause of action upon persons "adversely affected or aggrieved by agency action within the meaning of a

relevant statute." 5 U.S.C. § 702; *see Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). However, this waiver is not absolute. By its own terms, the APA's waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Furthermore, the waiver is restricted to claims "seeking relief other than money damages" for which there is "no other adequate remedy in a court." 5 U.S.C. §§ 702, 704. Here, the availability of the APA waiver hinges on whether the State's challenge to the grant termination is truly an administrative claim or, as Respondents argue, a contract dispute that falls under the exclusive jurisdiction of the Tucker Act.

As relevant here, the Tucker Act vests jurisdiction in the Court of Federal Claims over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, *or upon any express or implied contract with the United States*, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (emphasis added). Respondents assert the Tucker Act requires this case to be heard in the Court of Federal Claims because the Act impliedly bars relief for APA claims that sound in contract when brought in a federal district court. ECF No. 15 at 1–2; *see United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1022 (9th Cir. 2023) ("Where a statute vests exclusive jurisdiction over a category of claims in a specialized court (*e.g.*, the Court of Federal Claims), it 'impliedly forbids' an APA action brought in federal district court."). As courts have observed, "[t]he 'jurisdictional boundary' between the Tucker Act and [the APA] is well-traversed by litigants seeking relief against the federal government . . . [yet] the boundary's precise contours remain elusive." *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277,

292 (D. Mass. 2025) ("*NIH I*") (quoting *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1117 (Fed. Cir. 2007)).

The crux of the inquiry is whether this Court retains jurisdiction over the APA claims or if the Tucker Act requires them to be brought in the Court of Federal Claims: in essence, whether the Tucker Act expressly or impliedly bars application of the APA's waiver of sovereign immunity as it relates to the Award termination at issue.

The dispositive jurisdictional question in resolving this issue is whether the claims are, at their core, contractual in nature. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982) ("[A]n action against the United States which is at its essence a contract claim lies within the Tucker Act and [] a district court has no power to grant injunctive relief in such a case."); *Massachusetts v. Nat'l Insts. of Health*, 164 F.4th 1, 12 (1st Cir. 2026) ("*NIH II*") (holding challenges to NIH's indirect cost-rate policy were properly brought under the APA notwithstanding downstream effects on grant payments); *R.I. Coal. Against Domestic Violence v. Kennedy*, 812 F. Supp. 3d 180, 188 (D.R.I. Oct. 23, 2025) (applying *Megapulse* to APA challenge regarding federal grant award). Although the State seeks equitable relief and a declaration that Respondents violated the APA, the form of relief alone does not determine the proper forum. *See Suburban Mortg. Assocs.*, 480 F.3d at 1124 ("We have cautioned litigants that dressing up a claim for money as one for equitable relief will not remove the claim from Tucker Act jurisdiction and make it an APA case.").

With those principles in view, the Court turns to whether the Tucker Act "impliedly forbids" the relief the State seeks by channeling its claims to the Court of Federal Claims. In the parlance of the Tucker Act, where the source of the relief sought is "money-mandating," it invokes the Court of Federal Claims' jurisdiction. *Lummi Tribe of the*

*Lummi Rsrv. v. United States*, 870 F.3d 1313, 1317 (Fed. Cir. 2017). In other words, the Tucker Act "has been interpreted to require that a plaintiff seeking to invoke the court's jurisdiction must present a claim for 'actual, presently due money damages from the United States.'" *Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 716 (Fed. Cir. 1998) (quoting *United States v. King*, 395 U.S. 1, 3 (1969)). The Court of Federal Claims generally can only award monetary relief. *See Massie v. United States*, 226 F.3d 1318, 1321 (Fed. Cir. 2000) ("Except in strictly limited circumstances, there is no provision in the Tucker Act authorizing the Court of Federal Claims to order equitable relief.") (citation omitted)); *King*, 395 U.S. at 4 ("[C]ases seeking relief other than money damages from the Court of Claims have never been 'within its jurisdiction.'"). On the other hand, it is well-understood that a plaintiff may pursue prospective and equitable relief in federal district court. *See id*. at 4–5.

The Supreme Court reaffirmed this jurisdictional framework in *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988), and recently confirmed its continued force in *Department of Education v. California*, 604 U.S. 650, 651 (2025) (per curiam). *See Bowen*, 487 U.S. at 905 ("The Claims Court does not have the general equitable powers of a district court to grant prospective relief. Indeed, we have stated categorically that 'the Court of Claims has no power to grant equitable relief.'") (quotation modified)); *Dep't of Educ.*, 604 U.S. at 651 ("[A] district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds.") (quoting *Bowen*, 487 U.S. at 910)).

Respondents contend two recent decisions from the Supreme Court's emergency docket control here and require the case to be sent to the Federal Claims Court. In *Department of Education v. California*, the Court held the district court lacked

jurisdiction under the APA to compel payment of money from the federal government after the termination of several education grants. 604 U.S. at 651. In its brief four-paragraph per curiam opinion, the Court concluded the "APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money,'" effectively rejecting the district court's injunction that blocked the termination of the grants and required payment of past-due obligations. *Id.* (quoting *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

In the other case Respondents cite, *National Institutes of Health v. American Public Health Association*, NIH adopted a policy barring funding for certain categories, including those based on diversity, equity, and inclusion. *See NIH II*, 164 F.4th at 11. The district court set aside the policy and the resulting grant terminations as unlawful under the APA. *See id.* NIH then sought a stay from the Supreme Court, which resulted in a one-paragraph emergency order granting the stay application in part and denying in part. *See National Institutes of Health v. American Public Health Association* ("*APHA*"), 606 U.S. \_\_, 145 S. Ct. 2658 (2025) (mem.). In her controlling concurrence,[6] Justice Barrett wrote that, consistent with *Department of Education*, "the District Court likely lacked jurisdiction to hear challenges to the grant terminations," as those claims "belong in the Court of Federal Claims." *Id.* at 2661 (Barrett, J., concurring). Yet she also concluded that "the District Court was likely correct to conclude that it had jurisdiction to entertain an APA challenge to the guidance," drawing a line between disputes over specific grant

---

[6] *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (quotation modified)). In *NIH II*, the First Circuit treated Justice Barrett's concurrence in *APHA* as controlling under the *Marks* doctrine and relied on it to distinguish between challenges to individual grant terminations (which belong in the Court of Federal Claims) and challenges to NIH's generally applicable guidance (which are properly brought under the APA in district court). *See* 164 F.4th at 12.

10

terminations and challenges to NIH's policy-level guidance documents governing grant terminations across the agency. *Id.*; *see also id.* at 2663 (Roberts, C.J., concurring in part and dissenting in part).

Whether or not brief orders issued from the emergency docket carry binding force, decisions control only where their reasoning applies to analogous circumstances. The threshold question here, then, is whether *APHA* and *Department of Education* arose from comparable circumstances—specifically, whether those cases involved the same type of agreement at issue in this case. Neither case involved a genuine dispute over the nature of the underlying agreements, which in those cases were indisputably grants employing "co-sharing method[s] of funding," not self-styled cooperative agreements. *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 288 (D. Mass. 2025); *see California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72, 78–79 (D. Mass. 2025) (describing the respective grant programs). Whether the Tucker Act applies to the Award turns on whether the Award constitutes a contract, and that same question determines whether *APHA* and *Department of Education* are on point.

### 2.  Existence of a Contract

The mere fact that an Award is labeled a "cooperative agreement" does not resolve whether it constitutes a government contract for purposes of the Tucker Act.[7] *See San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 463 (2019) ("[A]ny contract, including a cooperative agreement, could fall within [the Court of Federal Claims']

---

[7] According to 31 U.S.C. § 6305, "[a]n executive agency shall use a cooperative agreement as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when (1) the principal purpose of the relationship is to transfer a thing of value to [that entity] to carry out a public purpose . . . instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and (2) substantial involvement is expected between the executive agency and the [counterparty] when carrying out the activity contemplated in the agreement."

jurisdiction so long as the contract contains the four required elements . . . .").[8] The Federal Circuit recognizes the existence of a government contract when four elements are present: "(1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1339 (Fed. Cir. 2021). Plaintiffs do not dispute the existence of offer, acceptance, and governmental authority, but contend the cooperative agreement lacks sufficient consideration. ECF No. 25 at 10–11. "[I]n the context of government contracts," the Federal Claims Court[9] has explained "consideration must render a benefit to the government, and not merely a detriment to the contractor." *Metzger, Shadyac & Schwarz v. United States*, 12 Cl. Ct. 602, 605 (1987). The benefit rendered to the government "must be 'tangible' and 'direct,' rather than 'generalized' or 'incidental.'" *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 132 (D.D.C. 2023) (quoting *St. Bernard Par. Gov't v. United States*, 134 Fed. Cl. 730, 736 (2017), *aff'd on other grounds*, 916 F.3d 987 (Fed. Cir. 2019)).

Courts have likewise recognized the existence of consideration where plaintiffs "agreed to comply with an array of requirements attached to the receipt, use, and distribution of the grant money," *Columbus Reg'l*, 990 F.3d at 1340, or where recipients "collect, maintain, and provide data to [the government] about program performance and effectiveness," *Vera Inst. of Just. v. U.S. Dep't of Just.*, 805 F. Supp. 3d 12, 29 (D.D.C. 2025).

---

[8] A federal district court may rely on Court of Federal Claims decisions in determining where jurisdiction is proper under the Tucker Act. *See, e.g., R.I. Coal. Against Domestic Violence*, 812 F. Supp. 3d at 188–89.

[9] In 1992, Congress renamed the U.S. Claims Court to the U.S. Court of Federal Claims. *See* Pub. L. 102–572, title IX, § 902(a), Oct. 29, 1992, 106 Stat. 4516.

Here, the Award expressly disallows granularized requirements beyond semiannual progress reports required by federal regulation. *See* ECF No. 1-2 at 15 ("[F]unds are not included within this solicitation to support monitoring and research-focused projects. Effectiveness monitoring examines how well the project performs . . . ."); ECF No. 1-4 at 10 ("[Interim semiannual] [r]eporting requirements are described in 2 C.F.R. Sec. 200.328-.330, and 2 CFR Part 170 . . . ."); *see also Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.*, No. CV 25-1775, 2025 WL 2374528, at *16 (D.D.C. Aug. 14, 2025) ("While the awards set out specific expectations and requirements—for instance, the award recipient must provide performance reports and comply with other reporting obligations, audit requirements, prohibitions on using funds in ways that contradict the law, restrictions on use of funds for certain non-essential items, procurement standards, and so forth—those obligations on the recipients reflect conditions on the awards and do not constitute 'direct benefit[s]' to the government.") (quoting *St. Bernard Par.*, 134 Fed. Cl. at 735)). The minimal requirements the Award imposes may "advance the agency's overall mission," but that alone is not sufficient to create a direct benefit to the Government. *Hymas v. United States*, 810 F.3d 1312, 1328 (Fed. Cir. 2016). Nor does the cooperative agreement otherwise evince any other mutual intent to contract through the imposition of binding obligations running to the United States. *Cf. Columbus Reg'l*, 990 F.3d at 1339 ("[T]he language of the agreement itself speaks in terms of binding obligations, not aspirations.").

In *St. Bernard Parish*, the Court of Federal Claims considered whether a cooperative agreement between the United States Government and a local parish to remove sediment after Hurricane Katrina constituted a contract. *See* 134 Fed. Cl. at 732. The court held the agreement lacked consideration because it conferred no direct benefit

on the United States. *Id*. at 736. Although the project would result in "restoration of a natural resource and a reduction in the amount of emergency funds that the Government would spend in future flooding emergencies," that type of "generalized benefit is the hallmark of a money grant from the government to a locality for a worthy project that would have an incidental benefit to the government." *Id*. Thus, the cooperative agreement could not be construed as a contract and the Court of Federal Claims lacked jurisdiction under the Tucker Act. *Id*.

Respondents urge this Court to distinguish the case at hand from *St. Bernard Parish*, claiming that "specific benefits would flow to the government" from improvements to the West Branch River Crossing. ECF No. 28 at 10. That crossing is owned by the Maine Department of Transportation and partially funded with federal money, and Respondents speculate that structural repairs would ultimately save the federal government costs by not having to fund future improvements to the crossing. *See id*. at 10, 10 n.7. Yet Respondents never explain how this daisy-chain of potential cost-savings amounts to anything more than the kind of incidental, generalized benefit the court rejected in *St. Bernard Parish. Cf. Anchorage v. United States*, 119 Fed. Cl. 709, 713 (2015) (treating a cooperative agreement as a contract where it provided direct benefits to the government in the form of service fees, enhancement of access to a military base, and areas and facilities for government use). Indeed, Respondents identify no "direct benefits" sufficient to establish consideration. *See Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*, 789 F. Supp. 3d 66, 87–91 (D.D.C. 2025) (finding no consideration under the Tucker Act where the government could identify no direct or tangible benefits). That lack of direct benefit counsels against finding consideration here.

Because the Award lacks direct, tangible benefits running to the United States, it is not a contract for the purposes of the Tucker Act, and the Act's exclusive jurisdiction over contract claims is not triggered.

### 3. APHA *and* Department of Education

Respondents nevertheless argue *Department of Education* and *APHA* deprive this Court of jurisdiction notwithstanding the Award's noncontractual character. *See* ECF No. 15 at 8–14. This Court recognizes the Supreme Court's statement in *Department of Education* that "the APA's limited waiver of immunity does not extend to orders 'to enforce a *contractual* obligation to pay money' along the lines of what the District Court ordered [t]here." *Dep't of Educ.*, 604 U.S. at 651 (quoting *Great-W.*, 534 U.S. at 212) (emphasis added). But the reasoning in *Department of Education* necessarily assumes that the grants at issue were contracts, a jurisdictional prerequisite the Court reached without considering whether different grant agreements might fall outside the Tucker Act. *See Vera*, 805 F. Supp. at 28–29 ("It would be foolhardy to assume that the Supreme Court [in *Department of Education*] did not at least implicitly consider whether the grants at issue were contracts in the first place."); *Urb. Sustainability*, 2025 WL 2374528, at *17 ("[T]he Supreme Court's jurisdictional determination [in *Department of Education*] seemingly assumed that the grants in that case were subject to Tucker Act jurisdiction, without considering whether different grant agreements may not be contracts falling within the Court of Federal Claims' exclusive jurisdiction.").

In *APHA*, Justice Barrett's controlling concurrence likewise distinguished between claims that seek to enforce alleged contractual rights to payment—properly heard in the Court of Federal Claims—and APA challenges to NIH's policy-level guidance governing grant terminations across the agency, which may proceed in district court. *See APHA*, 145

S. Ct. at 2662 (Barrett, J., concurring). *Department of Education* and *APHA*—when read together—confirm that the APA's waiver does not extend to suits to enforce contracts for money, but they do not answer the antecedent question of whether a particular instrument is a contract at all.

Under the circumstances of the specific cooperative agreement at issue here, the Court finds the Award is significantly distinguished from the contractual grant terminations underlying these two cases. The Supreme Court stated in *Bowen* that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" 487 U.S. at 893. *Department of Education* did not overrule *Bowen*, and *Bowen* remains directly on point, as it fully encompasses the question of whether a "cooperative endeavor" between the Government and a participating state entity is money-mandating for purposes of the Tucker Act. *Bowen*, 487 U.S. at 883. This Court, therefore, is bound to apply *Bowen* in this instance. *See Hohn v. United States*, 524 U.S. 236, 252–53 (1998) (The Supreme Court's "decisions remain binding precedent until [it] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to th[e] [Supreme] Court the prerogative of overruling its own decisions.").

### 4. *Relief Sought*

Having determined the Award is not a contract and that *Bowen* remains controlling, the Court turns to the nature of the relief sought. The State does not seek

money damages, nor does the Award provide for them. *See generally* ECF No. 1-2. Instead, the State asks the Court to vacate the termination of the Award and enjoin Respondents from further disallowing access to the Project's funds. ECF No. 1 at 24–25. While Respondents characterize the State's requests as a contractual demand for payment, the State in fact seeks equitable relief to vindicate its statutory rights— specifically, a declaration that the termination is unlawful under the APA. *See* 5 U.S.C. § 706(2) (providing courts "shall . . . hold unlawful and set aside agency action" that violates the APA's substantive standards). Such relief is "precisely the relief that is afforded—indeed, required—by and routinely granted under the APA." *S. Educ. Found. v. U.S. Dep't of Educ.*, 784 F. Supp. 3d 50, 64 (D.D.C. 2025), *appeal dismissed*, No. 25-5262, 2025 WL 2793138 (D.C. Cir. Sept. 30, 2025) (quotation modified).

To reiterate, *Bowen* held "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" 487 U.S. at 893. Accordingly, the Court concludes that while Plaintiffs seek vacatur of the Award's termination—an act that may ultimately obligate Respondents to continue funding the Project—the financial consequence of that relief does not transform this administrative dispute into a contract action.

The requested injunction is purely equitable: it would set aside an allegedly illegal grant termination unless and until the Respondents conduct a constitutionally compliant process. The injunction is a mandate for legal compliance, not a claim for money damages. *See Pacito v. Trump*, 169 F.4th 895, 929 (9th Cir. 2026) (maintaining jurisdiction in district court where, "[u]nlike the grantees in *Department of Education* and [*APHA*], Plaintiffs do not seek backpay of funds or a guarantee of continued funding"); *cf. Dep't of Educ.*, 604 U.S. at 650–51 (reversing district court order that specifically required the

17

Government "to pay out past-due grant obligations and to continue paying obligations as they accrue").

In sum, the lack of consideration, the claims' statutory basis under the APA, and the Court of Federal Claims' inability to provide prospective equitable relief all confirm the Award is, "at its essence," noncontractual. *Megapulse*, 672 F.2d at 968. In reaching this conclusion, the Court joins the well-reasoned consensus of numerous other federal courts that have addressed this precise issue in the wake of *Department of Education* and *APHA. See, e.g., S. Educ. Found.*, 784 F. Supp. 3d at 64; *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 111 (D.D.C. 2025); *La. Delta Serv. Corps v. Corp. for Nat'l & Cmty. Serv.*, No. CV 25-378, 2025 WL 1787429, at *22 (M.D. La. June 27, 2025); *Green & Healthy Homes Initiative, Inc. v. Env't Prot. Agency*, 788 F. Supp. 3d 676, 696 (D. Md. 2025); *Widakuswara v. Lake*, 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting), *vacated after reh'g en banc*, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (vacating the panel's prior decision "for the reasons explained by Judge Pillard" in her dissent); *Metro. Transp. Auth. v. Duffy*, No. 25-CV-1413, 2026 WL 588117, at *32 (S.D.N.Y. Mar. 3, 2026); *Pacito*, 169 F.4th at 929–30.[10]

The core function of the federal courts is to "independently identify and respect [congressional] delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 404 (2024). When the threshold issue is whether an agency acted within its congressionally delegated power, the APA vests the authority to resolve that dispute in the federal district courts—not the Court of Federal

---

[10] The Court has considered all cases cited in Plaintiffs' and Respondents' notices of supplemental authority. *See* ECF Nos. 31, 32. As such, Plaintiffs' motion for leave to file supplemental authority is moot. ECF No. 32.

Claims. Indeed, Respondents' interpretation would create a jurisdictional vacuum: the District Court would lack authority to vacate the action, while the Court of Federal Claims would be powerless to provide the equitable relief to remedy the alleged illegality. Accepting Respondents' position would effectively insulate a significant category of agency action from meaningful judicial oversight—a result at odds with the "strong presumption" favoring judicial review of administrative action. *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015).

Because jurisdiction over these claims is proper in this Court, Respondents' motion to dismiss Counts I, II, and III for lack of subject matter jurisdiction is **DENIED**.

### B. Constitutional Claims (Counts IV and V)

The State brings two constitutional claims: the first asserting violations of the Appropriations and Take Care Clauses and separation of powers principles (Count IV), and the second asserting a violation of the Tenth Amendment (Count V). ECF No. 1 at 20–23. Respondents argue these claims are merely "dressed up" versions of the grant termination issue and must be dismissed for lack of subject matter jurisdiction pursuant to the Tucker Act. *See* ECF No. 15 at 2.

The Court disagrees. The source of the rights Plaintiffs seek to vindicate is the Constitution—specifically, the principle "that the Constitution gives Congress, not the Executive Branch, exclusive power over spending," *Harris Cnty., Tex. v. Kennedy*, 786 F. Supp. 3d 194, 205 (D.D.C. 2025), and the prohibition against the Executive Branch unduly coercing states through conditional fund disbursement, *see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012) ("*NFIB*").

Despite Respondents' characterization, these claims are based fundamentally in the Constitution and are independent of the Award's specific provisions. Plaintiffs assert

the Executive Branch overstepped its bounds by unilaterally altering congressional appropriations and attempting to punish Maine for an unrelated policy dispute. *See* ECF No. 1 at 20–23. The merits of these arguments are not subsumed by the existence—or lack thereof—of a contract, because resolving them does not require an analysis of the cooperative agreement itself. *See R.I. Coal. Against Domestic Violence*, 812 F. Supp. 3d at 189 (rejecting a Tucker Act challenge where constitutional claims required a "review of the relevant statutes and regulations, not an analysis of any current or prospective grant agreements").

Where the "source of the rights upon which the plaintiff bases its claims" is constitutional, it is appropriate for the district court to hear the claims in the first instance. *Megapulse*, 672 F.2d at 968; *see Vera*, 805 F. Supp. 3d at 25 (retaining jurisdiction over separation of powers, Spending, Appropriations, and Take Care Clauses claims related to a terminated grant). As other courts have recognized, "the mere presence of a contract in relation to a [separation of powers] claim is not enough to deprive this [] district court of jurisdiction over the claim." *Harris Cnty.*, 786 F. Supp. at 205; *see also Am. Bar Ass'n v. U.S. Dep't of Just.*, 783 F. Supp. 3d 236, 243 (D.D.C. 2025) (holding that because the source of the right was the Constitution and not the cooperative agreement, the claim was not "essentially a contract action") (quotation modified)).

Because these claims turn on constitutional limits rather than contractual obligations, the Court has jurisdiction to consider Counts IV and V. This portion of Respondents' motion to dismiss for lack of jurisdiction is **DENIED**.

## II.    Failure to State a Claim (Counts IV and V)

Having confirmed its subject matter jurisdiction over the constitutional claims in Counts IV and V, the Court turns to Respondents' alternative argument that these counts

20

fail to state a claim upon which relief can be granted. *See* ECF No. 15 at 18; Fed. R. Civ. P. 12(b)(6). In evaluating a motion to dismiss under Rule 12(b)(6), the Court follows a two-step approach. *See Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). First, it "isolate[s] and ignore[s] statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Id*. Second, taking the well-pleaded factual content as true and drawing all reasonable inferences in the Plaintiffs' favor, the Court determines whether those facts plausibly support a claim for relief. *See Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (discussing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

## A. Violations of the Separation of Powers and the Appropriations and Take Care Clauses (Count IV)

Plaintiffs' first constitutional claim asserts that only Congress may exercise the power of the purse, *see* ECF No. 1 at 20–22; consequently, because the Award funds have already been appropriated, the Executive cannot unilaterally terminate the project and refuse to spend the money. *See Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992). Plaintiffs contend that NOAA's termination of the Award violates the separation of powers, the Appropriations Clause, and the Take Care Clause[11] because the Executive Branch may not "unilaterally amend, cancel, undermine, or otherwise decline to execute duly enacted Congressional appropriations."[12] ECF No. 1 at ¶ 75; *see* U.S.

---

[11] The Court also notes that Take Care Clause claims are rarely recognized as an independent mechanism for affirmative relief in this context. *See Arizona v. Mayorkas*, 600 F. Supp. 3d 994, 1011 (D. Ariz. 2022) ("It appears that . . . no court has ever held that the Take Care Clause provides a mechanism to obtain affirmative relief against the President or other executive branch officials.") (collecting cases).

[12] For the purposes of this Order, the Court treats the separation-of-powers principles underlying the Appropriations and Take Care Clauses as coextensive.

21

Const. art. II, § 3 (The Executive shall "take Care that the Laws be faithfully executed."); U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."). Respondents counter that Plaintiffs' argument merely restates their APA claim in constitutional garb—asserting only that the agency has exceeded its statutory authority. ECF No. 15 at 19.

To resolve this dispute, the Court must evaluate the boundary between congressional spending power and executive administration. *See Boumediene v. Bush*, 553 U.S. 723, 746 (2008). As a threshold matter, because agencies are "creatures of statute," they possess "only the authority that Congress has provided them." *NFIB*, 595 U.S. at 117. When Congress appropriates money for specific purposes, the Executive Branch generally must spend it.[13] *See Train v. City of N.Y.*, 420 U.S. 35, 42–44 (1975). This principle is codified in the Impoundment Control Act and the Anti-Deficiency Act, which prohibit executive officers from holding appropriated funds in reserve except in narrow, specified circumstances. *See* Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 929 (1982) (codified at 31 U.S.C. § 1512) (prohibiting executive officers from holding appropriated funds in reserve except in certain circumstances); 2 U.S.C. § 683 (ICA). Thus, when "previously appropriated money is available for an agency to perform a statutorily mandated activity," an agency cannot refuse to carry out that mandate. *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013).

However, a distinction exists between an executive refusal to spend appropriated funds at all and an agency's discretionary decision to re-allocate funds among different grantees. While the Executive cannot refuse to spend appropriated funds without

---

[13] The Court assumes without deciding that these constitutional constraints apply equally to subordinate executive agencies like NOAA as they do to the President. *See In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013).

congressional approval, Congress ordinarily leaves agencies with broad discretion to administer those funds pursuant to statutory guidelines. *See Harris Cnty.*, 786 F. Supp. 3d at 208. To state a separation-of-powers claim in this context, Plaintiffs must plead facts showing that Congress specified the exact manner in which these funds must be spent—rendering the spending non-discretionary—and that the Executive has effectively "repealed" that spending through inaction. *Id.* at 211.

Plaintiffs argue that terminating the Award functioned as a blanket refusal to spend the money appropriated for the West Branch River project. *See* ECF No. 25 at 22. Respondents, however, assert that they do not intend to impound the funds, but rather intend to re-obligate them to other projects under the *Coastal Resilience* program. ECF No. 15 at 19. The facts alleged in the Complaint favor the Respondents' characterization. Unlike the Government's attempt in *Sierra Club v. Trump* to "reprogram" funds for a purpose never authorized by Congress (a border wall), the funds here remain within the *Coastal Resilience* program for which they were appropriated. *Cf.* 929 F.3d 670, 694 (9th Cir. 2019). The program allows for generalized funding for habitat restoration, and the State admits in its Complaint that "NOAA has continued to fund . . . projects outside of Maine" under the same program. ECF No. 1 at ¶ 42. Because the program's funding is open-ended, there is no indication that NOAA's decision to re-obligate money to other coastal projects constitutes a unilateral amendment of a congressional appropriation. Rather, it appears to be an exercise of administrative discretion—even if, as Plaintiffs allege, that discretion was exercised unlawfully under the APA. Nor does this case resemble the "coercive" funding withdrawals found unconstitutional in other contexts. This is not an attempt to withdraw all federal funding from a state to achieve an unrelated policy goal, *see City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018), nor an

23

attempt to completely abolish a federal agency, *see Rhode Island v. Trump*, 810 F. Supp. 3d 283, 310 (D.R.I. 2025). Because the State has not pleaded facts establishing that NOAA will leave the funds unspent or use them for a purpose unauthorized by the appropriations statute, its separation-of-powers claim fails.

Finally, the Court is mindful that constitutional claims predicated on the termination of federal funds are often better characterized as "the stuff of APA litigation." *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 786 F. Supp. 3d 237, 262 (D. Mass. 2025). As the Supreme Court has noted, not every executive action in excess of statutory authority is *ipso facto* a violation of the Constitution. *See Dalton v. Specter*, 511 U.S. 462, 472 (1994). Plaintiffs' core grievance is that the Executive Branch exceeded its statutory authority by terminating the Project without following proper administrative standards. Because this case can be resolved on statutory grounds under the APA, the Court declines to reach the grave and delicate constitutional questions raised in Count IV. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court has frequently called attention to the 'great gravity and delicacy' of its function in passing upon the validity of an act of Congress . . . ."). Accordingly, Respondents' motion to dismiss Count IV is **GRANTED**.

### B. Violation of the Tenth Amendment (Count V)

Plaintiffs' second constitutional claim alleges NOAA terminated the Award in impermissible retaliation against the State for Governor Mills's policy position, thereby violating the Tenth Amendment. ECF No. 1 at 23. Respondents characterize the termination as mere "[m]ild encouragement by the federal government to effect state policy changes" that does not run afoul of the Constitution. ECF No. 15 at 22.

"States are not mere political subdivisions of the United States." *New York v. United States*, 505 U.S. 144, 188 (1992). Under the Tenth Amendment, the federal government is barred from infringing on state sovereignty by unduly coercing a state to adopt a federal regulatory scheme. *Id*. This prohibition applies whether the government "directly commands" a state to regulate or "indirectly coerces" a state to adopt a federal policy through the threat of financial loss. *NFIB*, 567 U.S. at 578.

Respondents argue that withdrawing the $9 million Award is only minimally coercive because the sum equals "less than [0].045%" of Maine's annual budget. ECF No. 15 at 23. This argument, however, misapprehends the governing law in two ways. First, the relevant measure of coercion is not restricted to a percentage of the state's overall budget; the loss of a significant portion of a specific, long-standing program's funding can also be coercive. *See South Dakota v. Dole*, 483 U.S. 203, 211 (1987) (evaluating the loss of "5% of the funds otherwise obtainable under specified highway grant programs"); *but see NFIB*, 567 U.S. at 582 (finding coercion where the threatened loss exceeded "10 percent of a State's overall budget"). Here, the record is silent as to what percentage of the Maine DMR's specific restoration budget the Award comprises. *See generally* ECF No. 1.

Second, and more importantly, Respondents misconstrue Plaintiffs' burden at this stage of the litigation: Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The precise point at which financial inducement becomes a "gun to the head" remains undefined. *NFIB*, 567 U.S. at 581; *see id*. at 642 n.24 (Ginsburg, J., concurring in part, concurring in judgment in part, and dissenting in part) ("But how is a court to judge whether only 6.6% of all state expenditures is an amount States could or would do without?") (quotation modified)). Plaintiffs allege "NOAA's termination of the Project grant will have a significant impact

25

on Plaintiffs' efforts to restore the ecosystem services and natural functions of the fresh and saltwater habitats in the West Branch Pleasant River and to improve coastal resilience in an underserved region." ECF No. 1 at ¶ 45. Whether the Award termination crosses the line into impermissible inducement is a factual question the Court cannot resolve at the motion to dismiss stage. *See City & Cnty. of S.F. v. Trump*, No. 25-CV-01350, 2026 WL 145874, at *13 (N.D. Cal. Jan. 20, 2026) (declining to dismiss a Tenth Amendment claim where the plaintiffs plausibly suggested that losing the given funding would "cripple their ability to deliver critical services to their communities") (quotation modified)).

Therefore, the Court finds Plaintiffs have pleaded a plausible Tenth Amendment claim. Respondents' motion to dismiss as to Count V is **DENIED**.

**CONCLUSION**

For the foregoing reasons, Respondents' Motion to Dismiss (ECF No. 15) is **GRANTED IN PART** and **DENIED IN PART.** Respondents' motion to dismiss Counts I, II, III, IV, and V for lack of subject matter jurisdiction is **DENIED**. Respondents' motion to dismiss Count IV and Count VI for failure to state a claim is **GRANTED**, and those claims are hereby **DISMISSED**. Respondents' motion to dismiss Count V for failure to state a claim is **DENIED**. Plaintiffs' motion for leave to file supplemental authority (ECF No. 32) is **DISMISSED AS MOOT**.

So Ordered.

Dated this 14th day of April, 2026.

/s/ Stacey D. Neumann
**UNITED STATES DISTRICT JUDGE**